[Cite as *In re L.B.*, 2011-Ohio-4892.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MERCER COUNTY

**IN THE MATTER OF:**

    **L. B.,**                                      **CASE NO.  10-11-06**

**ALLEGED DEPENDENT CHILD,**

**[KERMIT BRICKER,**
      **APPELLANT/FATHER],**                      **O P I N I O N**
**[BELINA BRICKER,**
      **APPELLANT/MOTHER].**

**IN THE MATTER OF:**

    **R. B.,**                                          **CASE NO.  10-11-07**

**ALLEGED DEPENDENT CHILD,**

**[KERMIT BRICKER,**
      **APPELLANT/FATHER],**                      **O P I N I O N**
**[BELINA BRICKER,**
      **APPELLANT/MOTHER].**

**Appeals from Mercer County Common Pleas Court
Juvenile Division
Trial Court Nos. 32009023 and 32009024**

**Judgments Affirmed**

**Date of Decision:   September 26, 2011**

Case Nos. 10-11-06 and 10-11-07

**APPEARANCES:**

*Donna M. Post* **for Appellants**

*Andrew J. Hinders* **for Appellee**

*Matthew L. Gilmore*, **Guardian Ad Litem**

**SHAW, J.**

{¶1} Appellants, Kermit Bricker ("Kermit") and Belina Bricker ("Belina") appeal the February 14, 2011 judgments of the Common Pleas Court, Juvenile Division, of Mercer County, Ohio, granting permanent custody of their two children, L.B. and R.B., to the Mercer County Department of Job and Family Services (the "Agency") and terminating their parental rights to these children.

{¶2} The facts relevant to these appeals are as follows. In January of 2009, Kermit contacted the Agency because he and Belina, who was pregnant with twins, L.B. and R.B., at the time, needed financial assistance for food and medical bills. Through this contact, they began receiving assistance from the local Help Me Grow program, which provided a service coordinator to help them learn to take care of a baby. Around the same time, Kermit began counseling with Erin Seitz at Foundations Behavioral Health Services ("Foundations").

{¶3} The twins were born in April of 2009. Help Me Grow continued to provide services to Kermit and Belina, who lived in Mendon, Mercer County, Ohio, at the time. In addition, the Agency became more involved with the family and assigned an on-going caseworker, Marge Zwiebel, to work with the couple and their children. During this time, the Agency also provided additional financial assistance to the family by helping them pay their utility bills.

{¶4} In early July of 2009, Belina, who suffers from a number of maladies, was hospitalized and Kermit was left to care for the children on his own. He was unable to do so, which resulted in the Agency filing complaints in the Common Pleas Court, Juvenile Division, alleging that the children were dependent. The children were removed from their parents' care and placed in the care of the Agency. On September 10, 2009, the trial court held an adjudicatory hearing, found that the children were dependent, and proceeded to disposition, whereby it granted temporary custody of the children to the Agency. The trial court also adopted the case plan proposed by the Agency.

{¶5} Both parents underwent a parenting evaluation by Dr. Frederick Ferri, who filed his report with the court on April 30, 2010. On May 10, 2010, the Agency filed motions for permanent custody of the children. The parents filed motions to have a second parenting evaluation conducted by a different expert, which were granted under the condition that the parents provide the name of this

second expert by July 30, 2010. Although the court was willing to pay for a second evaluation and the parents provided the name of a second expert, this expert declined the request to conduct a parenting evaluation and the parents did not provide the trial court with the name of any other expert.

{¶6} In June of 2010, Kermit and Belina moved to Delphos, Ohio, which is partially located in Van Wert County, Ohio, because they were evicted from their home in Mendon, Ohio. A few months later, they moved to a different apartment in Delphos, which was located in the Allen County portion of Delphos.

{¶7} On August 17, 2010, visitation between the children and Kermit and Belina was suspended due to the concerns of the children's physician that one or both of the parents may have had an infection that was compromising the children's immune systems. Based on the recommendations of the physician, the court ordered that the parents be tested for "cryposporidum," "c-def," and an infection that could suppress the immune system and ordered that visitation could begin again when the children's physician determined that they were medically able to resume visitation with their parents. Although the parents testified that they were tested for all three illnesses, as of the date of the permanent custody hearing, the Agency had not received the results of the cryposporidum test, and the parents had not visited with the children since July of 2010.

{¶8} The permanent custody hearing was held on December 6, 2010. Also on that date, the children's guardian ad litem ("GAL") filed his report, recommending that the Agency be granted permanent custody of the children as the same was in their best interests. The trial court took the matter under advisement, and later granted the Agency's motions for permanent custody and terminated Kermit and Belina's parental rights to L.B. and R.B. This appeal followed, and Kermit and Belina now assert one assignment of error for our review.

**THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED WHEN IT TERMINATED APPELLANTS PARENTAL RIGHTS AND AWARDED PERMANENT CUSTODY TO THE DEPARTMENT OF JOB AND FAMILY SERVICES.**

{¶9} As an initial matter, we note that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Franklin*, 3rd Dist. Nos. 9-06-12, 9-06-13, 2006-Ohio-4841, citing *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680. The Supreme Court of Ohio has held that a parent "must be afforded every procedural and substantive protection the law allows." *In re Hayes*, supra, quoting *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45. Thus, it is with these constructs in mind that we proceed to determine whether the trial court erred in granting permanent custody of the children to the Agency.

{¶10} Section 2151.414 of the Revised Code provides, inter alia, that a trial court

> **may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **(a)  The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**
>
> **\* \* \***

R.C. 2151.414(B)(1)(a) (Emphasis added).  The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established."  *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, 120 N.E.2d 118.  Further, "[i]t is intermediate; being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.  It does not mean clear and unequivocal."  *Id*., citing *Merrick v. Ditzler* (1915), 91 Ohio St. 256, 110 N.E. 493.  In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the

trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross*, supra (citations omitted); see, also, *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, 481 N.E.2d 613.

{¶11} In regards to making a finding pursuant to R.C. 2151.414(B)(1)(a), the Revised Code states as follows:

> **(E) In determining at a hearing held pursuant to division (A) of this section * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * that *one or more of the following exist* as to each of the child's parents, the court *shall* enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**
>
> **(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**
>
> **(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the**

**present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 [2151.35.3] of the Revised Code**

\* \* \*

**(16) Any other factor the court considers relevant.**

R.C. 2151.414(E) (emphasis added).

{¶12} In the case sub judice, the trial court concluded that the Agency had provided reasonable services and attempts to assist the parents to remedy the problems that initially caused the children to be removed from the home and that despite these efforts, Kermit and Belina have failed to successfully remedy the conditions causing the children to be removed from the home and they are unable to provide an adequate, safe, permanent home for the children now or in the reasonable future. In reaching this conclusion, the trial court found that the mental and physical issues of Kermit and Belina prevent them from providing a safe environment to their children. Further, the court found that based on the evidence before it, that it was in the children's best interest to grant the Agency permanent custody of them.

{¶13} The undisputed evidence before the trial court revealed that both parents suffer from a number of physical and mental issues. Kermit suffers from hepatitis C, emphysema, diabetes, cirrhosis of the liver, post-traumatic stress

disorder, and major depressive disorder. Belina suffers from hepatitis C, psoriasis, seizures, congestive heart failure, diabetes, fibromyalgia, rheumatoid arthritis, asthma, emphysema, underactive thyroid, chronic obstructive pulmonary disease (commonly known as "COPD"), schizoaffective disorder (bipolar type), post-traumatic stress disorder, and personality disorder NOS ("not otherwise specified"). Although Belina was prescribed a number of medications, the evidence demonstrated that she often would fail to timely re-fill her prescriptions and would stop taking her medication. Kermit also testified that he had been prescribed medication for his depression but that he did not take it because he had a prior history of being addicted to alcohol and drugs and did not want to relapse into those addictions. Instead, his "cure for depression is to get out and work, do something." (Perm. Cust. Hrg., 12/6/10, p. 157.)

{¶14} During the hearing, Dr. Ferri, a licensed psychologist in the State of Ohio for the past thirty-one years, testified that he administered a number of psychological tests, including an intelligence assessment, to both Kermit and Belina. He also reviewed hospital records, records from Foundations including diagnostic assessments, a number of police reports involving Kermit and Belina, case notes from Help Me Grow, and the Agency's service plans for them. In addition to the tests he administered, Dr. Ferri had five appointments, totaling approximately seven hours, with Kermit and Belina individually, together, and

together with their children.  Dr. Ferri utilized all of this information in assessing

their parenting abilities and concluded as follows:

> **as individuals and as parents, they significantly lack parenting abilities, both individually and collectively; and \* \* \* that really they have a very dependent relationship on each other.  They haven't been able to take care of themselves to speak of, and I felt it was extremely difficult for them to take care of a child and let alone children.**

(Perm. Cust. Hrg., 12/6/10, p. 16.)   After giving this conclusion, the following

testimony was elicited:

> **Q:  \* \* \* What do you think their potential is to successfully parent?**
>
> **A:  I think given the history that I learned through the records and given the data that I obtained myself, the probability of them learning how to become more effective parents I think is minimal.**
>
> **Q:  And is that ability to learn even with services provided by the individuals that you referred to in the review?**
>
> **A:  I think that's a very critical factor because the record that I had up until that time indicated that Children's Services in particular had, in my opinion at least, provided them with extensive ancillary help or supportive help to help teach them parenting.  And despite all of the, all of the training, if you will, all the efforts provided by Children's Services, when I saw them, my thought, my impression was that all of that training really had not helped them at all.  And so that would lead me also to believe based on what I saw that when one projects into the future, the likelihood of them developing parenting skills is very, very low given that they've had, in my opinion they've had ample opportunity to learn because of all the services that have been provided to them, without success in my opinion.**

(id. at pp. 16-17.)

{¶15} On cross-examination, Dr. Ferri testified that he issued his report on April 29, 2010, some seven months before the hearing date. He was then asked, "Is it possible that through counseling or other remedy situations that their shortcomings that you perceive in the Brickers could have been remedied since that day?" (id. at p. 18.) Dr. Ferri responded, "I would be very surprised if the shortcomings would be remedied in that period of time from May through now. I would be very surprised." (id.) He was also asked if his opinion that Kermit and Belina do not have the abilities to be good parents was based primarily upon their disabilities. Dr. Ferri responded,

> **My opinion is based upon several factors. Number one, a review of their history that I obtained \* \* \* and the very unstable developmental history that both of these individuals experience, number one. Number two, it's based upon the rather – I guess I would call it quasi-nomadic lifestyle. That haven't had a – because of that developmental history, they haven't had a significant time to establish themselves in their own relationship. They've moved, et cetera. Thirdly, yes, there are some physical documentation in terms of their particular illnesses. Okay? But I've had a chance to review that. Fourth, \* \* \* their intellectual abilities and their mental health issues play a significant role in the difficulty they have with parenting. Essentially, to try to answer your question more specifically, essentially without a history of emotional attachment, it becomes extremely difficult, in my opinion, for both of these individuals to establish and develop any type of emotional psychological attachment with their children, with the two children that they have.**

(id. at pp. 20-21.)

{¶16} The evidence before the trial court further revealed that when the children were first removed in July of 2009, Kermit and Belina were offered visitation at the Agency four times per week. During this time, Zweibel provided transportation on one occasion and offered a second time, but Kermit and Belina did not visit on this occasion. In August of 2009, the Agency assigned a parent mentor, Rose Obringer, to assist the family, which included transporting the children to Kermit and Belina's home for visitation once a week. Kermit and Belina were also permitted visitation at the Agency three additional days per week. However, in September of 2009, Kermit and Belina lost their vehicle, and the Agency arranged for Obringer to increase the number of times she transported the children to their parents' home for visitation to twice a week (each Monday and Thursday). In order to have Obringer bring the children for visitation, Zweibel required that Kermit and Belina contact either her or Obringer to let one of them know that they actually wanted to exercise visitation on that date. This arrangement continued until May of 2010, when the Agency filed for permanent custody. After that time, visitation was offered at the Agency once a week until August of 2010, when the trial court ordered visitation suspended for reasons related to the children's health.

{¶17} In total, Kermit and Belina had approximately 180 visitation days available to them between July of 2009 and August of 2010. A handful of the visits were canceled by the Agency due to inclement weather or the children being ill, but Kermit and Belina missed over 100 visits with the children due to no fault of the Agency, the children, or the weather. Zwiebel did testify that on December 9, 2009, Belina informed her that she had swine flu and would not be able to exercise visitation for the next three to four weeks. However, the following week, Kermit and Belina attended an appointment that the children had, explaining to Zwiebel that she was no longer contagious. Nevertheless, Kermit and Belina only visited with their children once in the month of December, despite having nineteen opportunities to do so, and exercised no visitation at all during the month of January, despite have sixteen opportunities to do so. The reasons given by Kermit and Belina for missing so many visits were that Belina was ill, that she had a number of doctor's appointment, that they had scheduling conflicts, or that they had to pay bills on the first day of the month. However, they did not provide documentation of the dates of these doctor's appointments, attempt to arrange visitation around any of these times, or otherwise detail why the number of missed visitations was so great.

{¶18} Beginning in January of 2009, before the children were born, Kermit and Belina also received assistance from Mary Fortman of Help Me Grow, who

would go to their home to teach them parenting skills. These services continued and were implemented into their case plan with the Agency once the children were removed. In addition, Obringer worked with Kermit and Belina to teach them parenting skills, often reinforcing what Fortman taught them on her previous visit. Services from Help Me Grow continued until June of 2010, when Kermit and Belina moved to another county.

{¶19} Two-hour sessions with Fortman and Obringer were scheduled to occur every Monday and Thursday at a certain time when the children were first born. However, Kermit and Belina were told to call Obringer before each visit to let her know that they would be home. Obringer would then contact Fortman.[1] The purpose of this arrangement was to ensure that Obringer and Fortman were not driving to Mendon from Celina only to discover that Kermit and Belina were not home. Once the children were older, Fortman's sessions with the parents were reduced to once every three weeks, but the Agency continued Obringer's services every Monday and Thursday. Fortman testified that from July of 2009, when the children were removed, until June of 2010, when Kermit and Belina moved out of Mercer County, she had twenty-four scheduled sessions but Kermit and Belina missed fourteen of these. According to Fortman, Belina informed them that she

---

[1] Fortman also testified that Kermit and Belina were permitted to contact her as well and then she, in turn, would contact Obringer.

was ill for four of these missed sessions but that the other ten missed sessions occurred without Kermit or Belina contacting Fortman or Obringer at all.

{¶20} Fortman testified that she attempted to teach them how to bathe the children, but they were never able to properly bathe the children on their own. Rather, she had to stand next to them and tell them step-by-step what to do each time Kermit and Belina tried to bathe the children. When Fortman attempted to teach them how to properly feed the children, they were never prepared to start. For instance, she would have to instruct them to wash the high chair because their cats had been on it. She also had to repeatedly remind them to talk to the children as they were feeding them because that type of interaction is an important part of attachment. Fortman also had them place a blanket on the floor to work with the children because of the uncleanliness of the floor and had to repeatedly remind them to clear the tables, including removing their diabetes medications, once the children were able to reach these items. Further, Fortman testified that Kermit would always be the one to interact with R.B. and that Belina would eventually interact with L.B., but that the parents rarely interacted with both children. Fortman also testified that she did not believe that any of the education she provided was completed because they could not give the children a bath by themselves, they had to be monitored at all times when feeding the children because they were inattentive which was both a safety and an attachment issue,

and they were not able to interact with both children at the same time, often ignoring one or the other. When asked if she observed whether there was any attachment between the parents and the children, she answered that she did not observe any attachment between them.

{¶21} Obringer, who was scheduled to bring the children twice a week for the vast majority of the time that the children were in the Agency's custody, also testified. She testified very similarly to Fortman, including that she had to address with Kermit and Belina that they needed to clean their home and needed to place their medications somewhere safe to protect the children. She testified that she stopped bringing the children to Kermit and Belina's home when the Agency filed for permanent custody in May of 2010, and that the home was more organized than when she first started coming to their home but that they had no electricity. However, after all of her involvement with Kermit and Belina, Obringer, who was not allowed to leave the children unsupervised with their parents, testified that she would not have felt comfortable, even if she were permitted to do so, leaving the children alone with Kermit and Belina for more than five minutes at the most.

{¶22} As for their living situation, Zwiebel testified that she regularly visited the home and sometimes it was clean and sometimes it was not, including when Belina's skin condition caused her skin to flake and these flakes would be everywhere in the home. In April of 2010, the utilities in their Mendon home

were shut off. Kermit testified that this led to their eventual eviction in June of 2010, and they moved to their first apartment in Delphos. Zwiebel testified that their first apartment in Delphos was clean on one occasion when she visited, but the next time she visited, skin flakes were all over the floor as well as what appeared to be diarrhea from one of their three cats which was swirled all over the floor. However, the second apartment they had in Delphos was clean when Zwiebel visited. Belina testified that they moved to this second apartment because they had an infestation of bed bugs in their first apartment but also acknowledged that they were behind on their rent by $700.00.

{¶23} Neither Kermit nor Belina were employed throughout their involvement with the Agency. Instead, they each received $505.05 in social security for a total of $1010.10. Kermit testified that he began receiving social security when he was released from prison after serving fourteen years and that the government provided this money to assist him "to get back on [his] feet." (Perm. Cust. Hrg., 12/6/10, p. 156.) Kermit was released from prison in November of 2005. Thus, by the time of the permanent custody hearing, he had been receiving social security for the last five years. The couple also received food stamps ($286.00 at the time of the permanent custody hearing), and for approximately six to seven months after the children were removed from their home, Kermit and

Belina received an additional $355.00 from the State of Ohio to assist them in maintaining their home so that they could be reunited with their children.

{¶24} Zwiebel testified that the Agency assisted Kermit and Belina in paying their utility bills while the children were still in their home but did not provide additional financial assistance for these types of expenses once the children were removed. In January of 2010, their home in Mendon was without heat for a time because they ran out of fuel oil, not having realized that their home, which was older, required quite a bit of fuel oil to heat it. In April of 2010, their utilities were shut off at their Mendon home, resulting in their eventual eviction in June. Belina testified that they were going to pay the past due utility bills but they gave this money to a friend to hold for them and the friend stole this money, which amounted to approximately $165.00.

{¶25} When asked why they had problems paying their bills, both admitted that Belina was in charge of making sure they were paid (Kermit testified that he was trying to teach her responsibility) but that at times she spent their money irresponsibly. Belina also testified that it was not their fault that they were past due with their rent at the first apartment in Delphos because they had "major bills * * * to catch up on." (id. at p. 184.) When asked what those were, she said she had to pay their cable bill of $150.00-$200.00 because they like to watch sports, a $50.00 pharmacy bill, and a $250.00 phone bill.

{¶26} The couple also received counseling at Foundations with transportation to this counseling being provided by Foundations. After the children were removed from their home, this counseling was continued and made a part of the case plan. Their counselor, Erin Seitz, testified that the major issue for which she counseled Kermit was financial stability and Belina's were coping with stress and parenting. Seitz testified that when she visited the home it was often dirty and smelled of animal urine. She also testified that they had sufficient income to keep their utilities if they had been careful about spending their money. Seitz testified that with her help, Kermit was able to establish a budget, but he was unable to maintain it. She also emphasized to Belina the importance of bonding with the children, making the home environment appropriate for them, and taking her medications. Seitz also referred the couple to a number of other resources in the community that provide assistance to the needy.

{¶27} Out of fifty-seven appointments she scheduled for Kermit, he canceled or failed to show for twelve of them. Out of the fifty-two appointments she scheduled with Belina, Belina canceled or failed to show for ten of them. Foundations also scheduled therapy sessions for Kermit and Belina. Belina attended fifteen of the twenty-nine that were scheduled, and Kermit attended twenty-six of the thirty-eight scheduled for him.

{¶28} Both Belina and Kermit testified that they were not bonded to the children. Kermit explained that he did not bond with them as much because he was trying to allow Belina to bond with them since she was their mother. Belina, who rarely interacted with the children or held them unless directed to do so, testified that it was difficult for her to bond with the children because she was afraid of hurting them emotionally or getting emotionally hurt herself. However, they both testified that they loved their children and wanted them back in their home.

{¶29} In light of all this evidence and in considering R.C. 2151.414(B)(1) and (D)(1), we do not find that the trial court erred in concluding that the case plan was reasonable and that the Agency provided reasonable services and attempts to assist the parents to remedy the problems that caused the children to be removed from the home. Further, the trial court had ample evidence to conclude that despite these efforts, Kermit and Belina failed to successfully remedy the conditions causing the children to be removed from the home and they were unable to provide an adequate, safe, permanent home for the children now or in the reasonable future. Moreover, considering this evidence and the GAL's report and recommendation, the trial court also had clear and convincing evidence to conclude that permanent custody to the Agency was in the children's best interest. Thus, we find that the trial court did not err in granting the Agency's motions for

Case Nos. 10-11-06 and 10-11-07

permanent custody.  Accordingly, the assignment of error is overruled, and the judgments of the Common Pleas Court, Juvenile Division, of Mercer County, Ohio, are affirmed.

***Judgments Affirmed***

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**